09:47:29AM

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN M. DOUGAN,<br>Plaintiff,<br>Vs.<br>TOWN OF WINDHAM,<br>Defendant. | ) | Docket No.<br>NO. 2:11-CV-00214-GZS |

DEPOSITION OF: JOHN M. DOUGAN, taken before Doreen J. Boyce, RPR, pursuant to notice dated September 20, 2011, at Richardson, Whitman, Large & Badger, 465 Congress Street, Portland, Maine, on October 4, 2011, commencing at 10:06 a.m.

APPEARANCES:

FREDERICK J. BADGER, JR., ESQ.
BENJAMIN P. CAMPO, JR., ESQ.

Doreen J. Boyce, RPR
BOYCE & LEIGHTON
Post Office Box 954
Scarborough, Maine 04074
(207) 883-0378





I N D E X

WITNESS

JOHN M. DOUGAN

See keyword index at end of transcript.

(Exhibits included in the original and copies.)

ORIGINAL





(Notice of deposition
Exhibit-No. 1 marked for identification.)
(Interrogatories
Exhibit-No. 2 marked for identification.)
(Request for production of documents
Exhibit-No. 3 marked for identification.)
(Resume
Exhibit-No. 4 marked for identification.)
(Application for employment
Exhibit-No. 5 marked for identification.)
(Questionnaire
Exhibit-No. 6 marked for identification.)
(Personal history statement
Exhibit-No. 7 marked for identification.)
(New hire packet checklist
Exhibit-No. 8 marked for identification.)
(Maine Human Rights poster
Exhibit-No. 9 marked for identification.)
(Windham Police Department rules and regulations
Exhibit-No. 10 marked for identification.)
(Letter dated 10/1/09
Exhibit-No. 11 marked for identification.)
(Letter dated 10/13/09
Exhibit-No. 12 marked for identification.)

JOHN M. DOUGAN, having been duly sworn by the Notary





Public, was deposed and testified as follows:

EXAMINATION-BY ATTY. BADGER:

Q. Could you state your name, please.
A. John Mark Dougan. Go by Mark.
Q. Where do you live, Mr. Dougan?
A. 21000 Portofino Circle, Number 102, Palm Beach Garden, Florida.
Q. How long have you lived there?
A. Nine months probably. 10 months.
Q. The last nine months consecutively, you've lived there ever since?
A. Yes.
Q. For a solid nine months?
A. Yes.
Q. Okay. You know what we're doing today; I'm taking your deposition in the lawsuit that you filed?
A. Yes.
Q. And I'm going to give you some instructions about what happens in depositions. Have you ever been deposed before?
A. I have.
Q. And on what occasion or occasions were -- was that?
A. Numerous times. I can't reca
officer, you naturally get depo
Q. Okay. Have you ever been d

EXHIBIT
A
Blumberg No. 5208

hired? Let me rephrase that.
At the time you were hired, did you discuss with whoever hired you, the chief or whoever interviewed you, the Howell case?
A. I did not.
Q. Okay. Why didn't you?
A. Because it wasn't relevant at that time.
Q. You didn't think that charge against you for pepper spraying someone as a police officer was relevant to your being hired at the Town of Windham?
A. It wasn't a charge against me.
Q. Okay. It was a charge against who?
A. The Palm Beach County Sheriff's Office.
Q. So, there was no charge against you individually for doing that?
A. I don't believe so, no.
Q. Okay. Exhibit Number 8 is -- let's see, just put that over here.
Exhibit Number 8 says new hire packet and I'll represent to you that's a document that comes from the Town of Windham?
A. That is.
Q. And the name on it at the top -- I'm sorry. The name on it at the top says John -- it says Dougan, comma, John Mark. Do you see that?





A. I do.
Q. And it says date hire, 1/16/09?
A. Correct.
Q. Does that comport with your memory about at least when you were hired?
A. Yes.
Q. If you go down like six or seven bullet points, there's a line that says sexual harassment/whistleblower. Do you see that?
A. I do.
Q. And do you remember being provided with any literature or information about the sexual harassment policy and whistleblower policy for the town and/or its police department?
A. I received so many documents. I'm not saying I didn't. I'm just saying -- you know -- I signed so many things -- you know -- I have no doubts that was one of them. Yes.
Q. Okay. And then let me show you Exhibit Number 9. It says at the top the Maine Human Rights Act prohibits sex discrimination. And I'll represent to you that's a poster -- this is a reduced copy of it but that's a poster.
A. Yeah.
Q. Okay. Are you familiar with such posters; have you seen





them in the past?
A. I've seen them, sure.
Q. Okay. Do you recognize that this is a poster that was posted somewhere in the public safety building and/or the police department?
A. May have been.
Q. The poster says sexual harassment on the job is illegal. You were aware of that; were you not?
A. Absolutely.
Q. It says unwelcome sexual advances are prohibited. Do you see that?
A. I do.
Q. You knew that?
A. Of course.
Q. Suggestive or lewd remarks are something that is also prohibitd; you were aware of that?
A. Yes.
Q. Okay. Unwanted hugs, touches, and kisses are something else that were prohibited?
A. Yes.
Q. At the bottom, this says Nancy Johnson, representative. Do you remember Ms. Johnson?
A. Vaguely.
Q. Okay. Do you remember her being the person who met with you and who reviewed with you the new hire packet,





Exhibit Number 8?
A. It -- I -- I guess. I mean I -- I don't remember Exhibit Number 8 being from her or from the town.
Q. Okay.
A. I mean -- you know -- you get mounds of paperwork so --
Q. Well, do you remember -- when you were hired, do you remember meeting with Ms. Johnson?
A. I do, yes.
Q. Okay. And -- okay. All right. And you remember, you already said, the checkmark under sexual -- sexual harassment and retaliation is something that you remember receiving documents for?
A. Sure. Yes.
Q. Okay. Exhibit Number 10 is the Windham Police Department rules and regulations and the subject is sexual harassment. It's regulation 1 dash 11. Effective date, it looks like a 3/31/95?
A. Uh-huh.
Q. Do you remember receiving this policy, rules and regulations sexual harassment from the town?
A. I did.
Q. And you were familiar with it from the time that you were hired up to the time you were terminated, I'm sure, correct?
A. I'm sure, yes.

department; you suspect it was Sergeant Denbow because of the browser; is that what you said?
A. Yeah. But he was terminated the day after so --
Q. I'm sorry. He was terminated the day after?
A. Yeah.
Q. Okay. Did -- did Chief Lewsen ever write back?
A. No.
Q. Did Chief Lewsen ever call you?
A. No.
Q. Okay. Let's go back to communication with people from the police department. Other than that communication where you wrote, you think in 2010, to the chief, after October 13, 2009, did you have any communication with anyone from the police department other than maybe seeing somebody and saying hi?
A. Like Lewsen?
Q. No. Like -- like -- well, let me limit it to Lewsen, Sergeant Andrew, Sergeant Denbow, Lieutenant DeGruchy.
A. You know, I may have. I just don't -- but it would -- it wasn't for anything other than -- you know -- maybe I -- I had a jacket -- that's right. I told him that -- I think I sent him an e-mail stating I didn't return my jacket because it was already at the substation.
Q. All right. Let me switch gears for a minute.
A. Okay.





Q. Did you ever have any conversation with anybody from the Windham Police Department after October 13, 2009, about your termination, the facts behind it, or Officer Cyr's complaints or Officer Judd's complaints?
A. Yeah. I had a conversation with Ernie MacVane.
Q. Okay. And Ernie, I think you already identified as a policeman and he's the one who you told Judd he better not see her? That's how I know him from what you've said.
A. That's the one I said -- because he was the union rep --
Q. Okay.
A. -- for the department.
Q. Okay. Forget my description. What conversation did you have or communication with officer --
A. I don't believe it was anything relevant to my termination.
Q. Okay. The question I'd asked you, though, and I thought you answered was did you have any communication with anyone else from the police department and I named some officers about the allegations or about your termination and you said sure, Officer MacVane.
A. Oh, okay.
Q. So, I don't know whether you did or not but --
A. Yeah. I don't recall that I did.
Q. Okay.





A. I mean maybe I voiced to him that I was pissed off at how everything went down. But other than that, I don't -- no. I don't believe so.
Q. Did -- did you -- during the time you were still employed with the police department, did you have any conversations with Officer MacVane about the differences with Cyr you had and the allegations that Cyr had against you?
A. Yes.
Q. Okay. And tell me about that.
A. I had written him a letter a day -- because I -- it all stems from a complaint that I made -- my last complaint that I made against her where she disregarded officer safety on a call and I had made another complaint and then Sergeant Denbow stated well -- you know -- we don't want this to be an issue. If you're going to -- if you're going to bring this forward, I'm going to investigate Officer Cyr's sexual harassment complaint.
Q. Okay. And was that -- when that happened, was that an in-person meeting you had with Sergeant Denbow?
A. It was.
Q. Okay. And anybody else present?
A. No.
Q. And just give me a time frame about when that happened.
A. It was the morning of -- or it was the evening that we





came in from that -- from the burglary at the pawn shop.
Q. Okay. Have we now covered all conversations you had -- let me go post -- post October 13, 2009, with any police officers from Windham?
A. Regarding my termination?
Q. Yeah. Regarding your termination or the allegations that led to your termination.
A. As far as I can recall, yes.
Q. Okay. Other than -- strike that.
Have you ever had conversations with anyone from the Town of Windham -- forget the police department for a minute -- the Town of Windham, anybody in the manager's office or likewise, about any issues about your termination or about Cyr's or anyone else's sexual harassment issues against you?
A. No.
(Letter dated 1/8/09
Exhibit-No. 13 marked for identification.)
Q. Exhibit 13 is a January 8, 2009, letter from Chief Lewsen to you. Is that -- do you recognize that?
A. I do.
Q. Is that a letter that you received when you started?
A. It is.
Q. Okay. And the last -- on the second page of that letter, it says your probationary period will be 12

months. You understand you were on probationary period; did you not?
A. Yes.
Q. The next paragraph and sentence says as police chief, I have the right to terminate your employment during the probationary period and my decision to terminate will not be subject to review as a disciplinary action. Did you understand that?
A. I did.
Q. Did you agree to that term?
A. I did.
(Supplemental disclosures Exhibit-No. 14 marked for identification.)
Q. Exhibit 14 --
MR. BADGER: Ben, I apologize. I don't have a copy for you.
MR. CAMPO: That's all right.
MR. BADGER: But it's the supplemental disclosure.
Q. Mr. Dougan, is the supplemental disclosure you filed in this case -- in federal court, there are mandatory disclosures you have to file and you filed one and then this is the supplemental one, okay?
A. Okay.
Q. And you can take your time to look at it if you want but I'm going to ask you some specific questions about it.





A. Okay.
Q. Individuals with discoverable information, which is category or paragraph number A, you talk about Melanie Judd, Katharine York, William Andrew, and Danielle Cyr. We talked about Judd, York, and Cyr. What is it that you understand that William Andrew has for information that's relevant to your lawsuit?
A. He was present during that meeting where she alleged that I had just pulled out my -- yeah -- and urinated in front of her.
Q. Go ahead. I -- you're doing fine. I asked you what information he had and you said he was present during that meeting.
A. Yeah.
Q. And while we're on that, who else was present during that meeting?
A. Sergeant Denbow.
Q. Okay. Was Cyr present?
A. Yes, she was.
Q. So, it was Denbow, Andrew, Cyr, and you?
A. That's correct.
Q. Anyone else?
A. No.
Q. Okay. While we're on that, what happened at that meeting? And was that a prearranged meeting and what





happened? First of all, I'm asking two questions. Was it a prearranged meeting?
A. It was a prearranged meeting.
Q. All right. Where was that meeting held?
A. It was held in the supervisor's office.
Q. Okay. And do you remember about when that meeting took place?
A. August 23 -- I'm just throwing August 23rd off the top of my head.
Q. Okay. And do you -- what was your understanding of the purpose of that meeting?
A. Well, I had officer safety issues with Cyr and they wanted me to confront her about it -- about them.
Q. Okay. I know you're saying they but are you talking about both Andrew and Denbow?
A. Sergeants Andrew and Denbow.
Q. Okay. And, in fact, that's -- is that one of the things that happened at the meeting?
A. That's one of the things that happened at the meeting.
Q. Okay. Without going into word for word, what -- you went to the meeting and what did you say -- how did it start out and what did you say about officer safety issues, if you did?
A. I believe, without going word for word, I said she had poor officer safety and that she was dangerous on some





of the calls.
Q. Okay. And what response was there from her or anyone else?
A. Well, she -- she -- I gave my account of an alarm that we had and then she gave her own account which was completely just out of left field.
Q. False and not true according to you?
A. Correct. I told Sergeant Denbow to pull the dispatch tapes, which he did, and he found that her statements were not true.
Q. Okay. And specifically, are you talking about two different incidents or one now when you say her statements weren't true?
A. Well, the last one that really concerned me was an alarm that we had at the Manchester School.
Q. And what's the difference in stories there just in summary? What was the issue about the Manchester School?
A. The Manchester School, we had an alarm. So, I responded to the alarm. I advised over the radio I was responding to the alarm. She advised -- she told Sergeant Denbow that she advised over the radio that she was responding to the alarm. I had cleared the whole perimeter, right. I parked way out by the road where you should park because that's good officer safety. You